According to the facts of this case, however, the award made by the Court of Appeal will not be disturbed.

For the reasons assigned, the judgment of the Court of Appeal for the First Circuit is affirmed, costs of this court to be borne by the plaintiff.

9 So.2d 38

## WILLIAMS et al. v. COLUMBIA LAND & TIMBER CO. et al.

### No. 36486.

### May 25, 1942.

Eugene H. Walet, Jr., and David Gertler, both of New Orleans, for plaintiffs-appellants.

Frank E. Powell, of De Ridder, P. B. Walker, of Houston, Tex., and Plauche & Plauche, of Lake Charles, for defendants-appellees.

FOURNET, Justice.

This action was instituted by the surviving heirs of William J. Williams and his wife, Nancy Mary Jane Williams, to recover the southeast quarter of Section 9, Township 6 South, Range 13 West, of Beauregard Parish, acquired by their late parents through a homestead certificate purchased from the State of Louisiana, on the ground that the deed of March 24, 1906, from which the present record owner of the property, the Columbia Land & Timber Company, Inc., of Louisiana, deraigns its title, is a forgery. Plaintiffs are also seeking to have declared null and cancelled from the parish records all subsequent mesne conveyances and alienations of the land, including a certain oil and mineral lease now owned by the Republic Production Company, Inc.

Both of the defendants denied that the said deed was spurious, and, in the alternative, pleaded the prescription of ten years acquirendi causa.

From a judgment of the lower court sustaining the validity of the act of March 24, 1906, recognizing defendants' title, and dismissing their suit, the plaintiffs prosecute this appeal. In this court, the American Republics Corporation, successor to and survivor by merger with the Republic Production Company, Inc., was substituted as a party defendant upon its own motion.

According to the conveyance records of Beauregard Parish, formerly a portion of Calcasieu Parish, William J. Williams acquired the property in controversy by a homestead certificate purchased from the State of Louisiana on March 12, 1898, the state issuing a patent therefor on May 24, 1904. This property fell into the community of acquets and gains existing between Williams and his wife, Nancy Mary Jane Herford. Both Williams and his wife having died in 1900, their succession was duly opened on March 1, 1906, and their children, Nancy M. (Williams) Wofford, Alice R. (Williams) Neeley, Columbus C. Williams, Robert J. Williams, and John H. Williams, as well as their grandson William H. Burge, the son of their predeceased daughter Amanda K. (Williams) Burge, were recognized as their sole and only heirs and, as such, sent into possession of

the property. On the 24th of the same month, these heirs, by deed executed before D. D. Herford, a notary public, transferred the property to David R. Swift, from whom the defendants deraign their title.

On July 26, 1939, thirty-three years later, this suit was instituted by the surviving heirs of William J. Williams and his wife —Nancy M. (Williams) Wofford and Robert J. Williams died in the meanwhile without issue—for the purpose of having the deed of March 24, 1906, annulled, the claim being that neither the plaintiffs nor their predeceased coheirs had ever signed the instrument or received the consideration recited therein. In other words, the plaintiffs are claiming that Herford or someone else forged the ten names that are signed to the deed of March 24, 1906, i. e., those of the six heirs and vendors, those of the husbands of two of the heirs, and those of the two men who witnessed the deed.

In order to establish their claim, the plaintiffs, one after another, as well as the two witnesses, Luther Dickerson and Andy Denby, who were all present in court, testified that they had not signed the deed. Burge's explanation was that he could not have signed the instrument since he was not even in the State of Louisiana during the month of March, 1906, having gone to Texas to work because he was afraid he would be prosecuted for some trouble he was in during the preceding Christmas holidays. The witness Dickerson's testimony is to the effect that he could not have witnessed the document, since he was in Texas working at the same place where Burge

was employed, while the other witness, Denby, stated he had never witnessed a deed in his life. In order to add weight to these simple denials, Columbus C. and John H. Williams both testified that from the time the family moved away from this homestead to the present day they have visited the property frequently, at least once or twice a year, and looked it over, at which times they called upon Charlie Jenkins, a negro who lived on the adjoining property and in whose care the property is alleged to have been left. On direct examination, Jenkins substantiated the testimony of the Williams brothers in this respect. The plaintiffs point out that their contention with reference to the forgery of the instrument is borne out by the fact that the signature of Alice R. (Williams) Nealy appears thereon as "Alice R. Neeley", although during her entire life she has always signed her name as Alice R. Nealy.

The defendants placed D. D. Herford, the notary public before whom the instrument was executed, on the witness stand and he testified in detail with respect to the history surrounding the confection of the deed. He stated that in the early part of 1906 David R. Swift employed him to assist in the blocking of a large tract of timber land in the vicinity of the Williams property and that it was as Swift's agent he contacted the Williams heirs with the view of purchasing from them the property left by their father and mother. Accordingly, after contacting Columbus C. Williams, the heir who apparently acted on behalf of the other members of the family, he

prepared in longhand a deed transferring the Williams property to David R. Swift by private act for the consideration of $400, going to DeRidder, where Columbus lived, and to Ludington, a small settlement about a mile from DeRidder, where the remaining heirs lived, for the purpose of consummating the transaction. This occurred on February 12, 1906, and although the instrument at that time was signed by all of the heirs with the exception of John H. Williams and William Burge (the latter's name does not appear therein as one of the vendors), it was never completed for the reason that it was discovered John H. Williams was still a minor and would not reach his majority for about another month. Herford further testified that upon his return to his home in DeQuincy, he reported the matter to Swift; that upon the suggestion of McCoy and Moss, Swift's attorneys in Lake Charles, the succession of William J. Williams and his wife was opened, the Lake Charles attorneys preparing the necessary papers therefor, these papers being taken to Columbus C. Williams, who signed the proof of heirship; that the Lake Charles attorneys also prepared a new deed covering the transfer of this property to Swift, which was to be executed after the heirs were placed in possession of the property on March 1, 1906; and that it was on the 24th of the same month that the deed in controversy here was executed, being recorded two days thereafter.

According to the record and the facts of this case, it appears that either the defendants or their ancestors in title have,

from 1906 to the present time, paid all of the taxes due on the property. Their title to the property remained unquestioned for some thirty-three years, or until 1938 when, after the discovery of the rich Bancroft oil field on adjoining property, a man by the name of Nutter went to Houston, Texas, to have Columbus C. Williams sign a lease to a small tract of 4 acres of land reserved as a graveyard when Williams sold to David R. Swift on February 12, 1906, the day on which the partially completed first deed to the Williams tract was executed, the 80 acres owned by him lying in the northeast quarter of Section 9, Township 6 South, Range 13 West, just north of the property acquired by William J. Williams. That the defendants or their ancestors in title have at all times since 1906 exercised every possible right of ownership over the property in controversy is borne out by the series of transactions concerning the land which date back as far as August 12, 1912, when David R. Swift transferred the same to the Swift Land Company, which company, on May 10, 1913, conveyed it to the Columbia Land & Timber Company, an Arkansas corporation. The Arkansas corporation transferred the property to the Columbia Land & Timber Company's Louisiana corporation on May 25, 1917, and since that time the Louisiana corporation has granted various rights and privileges in and to the land, which were exercised. These include the sale of timber thereon, with the right to construct a tramway in connection with the logging of the timber; the granting of rights-of-way for the laying of a

pipe line and for highway purposes; and the granting of mineral leases and exploration rights on the property, the last of these transactions having occurred no later than November 29, 1937, when a mineral lease was granted to the Republic Production Company, Inc., one of the defendants in this case.

The record further shows that under the transactions involving the conveyance of the timber on the property, the Peavy-Byrnes Lumber Company began cutting the pine on the same during 1924 and continued its operations until the latter part of 1926, when these timber rights were assigned to the Long-Bell Lumber Company. In connection with the logging of this pine from the land, the Peavy-Byrnes Lumber Company constructed at least three spur tracks branching from their main line, these spurs reaching in all directions and one entirely cutting across the quarter section. These spurs remained on the land for approximately a year, and even after their removal, evidences of their construction were still visible. Experts estimated that between 300,000 and 400,000 feet of pine were cut from the property during these years. Taking over the timber rights in the latter part of 1926, the Long-Bell Lumber Company began cutting the hardwood on the property. These operations continued for about a year, some 133,494 feet of hardwood being cut and logged during that time. After the cutting of the hardwood and the discontinuance of the operations in connection therewith in the latter part of 1927, the Long-Bell Lumber Company still continued intermittent cutting of timber from the property until as late as 1929. Taking into consideration the prices paid for lumber of this type during the years 1925, 1926, and 1927, it was estimated that at least $2,800.98 worth of timber was logged from this property under the timber rights.

In the light of all of these facts—particularly those contemporaneous with the confection of the deed and the subsequent circumstances—when considered in connection with the story told by the plaintiffs, which is full of contradictions, inconsistencies, and improbabilities, to say nothing of the fact that some of the plaintiffs' witnesses were impeached by other of their witnesses, we think that the plaintiffs have not only failed to establish their claim that the instrument of 1906 was forged by that clear and convincing evidence required for the setting aside of an authentic act on that ground, but that the evidence overwhelmingly preponderates against them.

It would serve no useful purpose to analyze the testimony of each and every witness in this case and point out the contradictions and inconsistencies in the testimony given by the plaintiffs in support of their ingenious story. Suffice it to say that an analysis of a portion of the testimony of the main witnesses for the plaintiffs, Columbus C. and John H. Williams and Charlie Jenkins, will serve as its own example.

Although the two Williams brothers claimed to have visited the property once or twice a year from 1906 until 1939, when this suit was filed, at those times calling on

Charlie Jenkins, in whose charge they are alleged to have left the land, we find that no one in the neighborhood ever saw either of them visit the place from the time they moved away after the death of their parents until oil was discovered on adjoining property in 1938. During this time, for a period of at least three years, the timber operations were in progress on the land, and, as pointed out above, not only were the tramways constructed for the logging of the timber in full view, but it was evident to a mere passer-by that the land was being stripped of its merchantable timber. Neither of the Williams brothers offered any explanation as to the purpose of their purported visits to this property. It could not have been to visit the graves of their father, mother, and the wife of Columbus C. Williams, since these graves were never visited. If it was to see that no damage was done to the property by trespassers, it is odd that after they discovered the timber had been removed from the land they did nothing whatever about recovering damages for these illegal operations. To explain their failure to institute suit for this purpose, they stated they saw no necessity for instituting suit to recover the value of the timber removed (estimated at $2,800.98) since it was of little value and the damage to the land was slight, particularly since they could not have gotten an attorney to handle the case for them at any profit to themselves. Furthermore, though they first testified they had visited the land every year, and at least once during the year, they later admitted that during the active timber years they had not visited the property, only discovering that the timber had been cut and removed some time in 1927, when the operations were practically over.

It is true that on his direct examination Charlie Jenkins corroborated the testimony of the Williams brothers with respect to the visits made to the property and to him each year, but we find that he later admitted he had worked for both the Peavy-Byrnes and the Long-Bell lumber companies when they were engaged in cutting the very timber he stated he was employed to watch over. When asked why he had not communicated this trespass and damage to the Williams family, he stated he was not interested enough in the matter to hunt them up, and that if he had been, he would not have known where to address them a letter. When pressed still further on cross-examination, he admitted that prior to the trial of the case he told defendants' counsel that when the family moved away from the property in 1901 they asked him to look after the crop and the farm implements left there for the harvesting of the crop, but that after the crop was harvested in the fall of 1901 and the implements removed, he had never seen Columbus C. Williams again until about a year before the trial of this case.

In passing, another inconsistency and improbability might be pointed out. It developed during the trial of the case that the witness Luther Dickerson was a brother-in-law of Nancy M. (Williams) Wofford, being the half-brother of her husband, and that the witness Andy Denby was the pal and chum of John H. Williams, being with him almost constantly during trips made by them at that time to play for

dances in the surrounding country. If Herford did forge the instrument of 1906, it is passing strange that he selected as the two witnesses names to be forged, those as closely connected with the Williams family as were Dickerson and Denby, particularly when he did not know these two men, never having seen them before they witnessed the instrument.

In their briefs the plaintiffs have laid great stress upon Herford's lack of memory with reference to the details of the transaction, such as where and when the instrument of March 24, 1906, was signed. The answer to the significance attached to Herford's lack of memory in this respect is that that star witness for the plaintiffs, Columbus C. Williams, was equally as vague with reference to the details of his sale of the 80-acre tract of land to David R. Swift on February 12, 1906, when the first deed was partially completed. As a matter of fact, we would be inclined to attach much more significance to the claim if Herford had, after a lapse of some thirty-three years, been able to give in detail all of the incidents connected with the signing of the instrument.

After a very careful consideration of this entire matter, we cannot but conclude that had it not been for the discovery of a rich oil field in the immediate vicinity of the property in controversy, the facts brought to light by the plaintiffs for the first time after thirty-three years in support of their claim would have slept undisturbed, never to be disclosed.

Moreover, even had the plaintiffs been able to prove their claim that the in-strument of March 24, 1906, was forged, under the particular facts of the case, the alternative plea of the prescription of ten years acquirendi causa would be good. Civ.Code, Art. 3474.

For the reasons assigned, the judgment of the lower court is affirmed, at plaintiffs' cost.